UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BRODEUR & COVILLE, LLC,

                    Plaintiff,

          v.

RESEARCH IN MOTION LIMITED

                    Defendant.

Civil Action No.  13-12324

## COMPLAINT AND JURY DEMAND

1.      This is a diversity suit for damages arising out of actions and omissions by Defendant Research in Motion Limited d/b/a BlackBerry ("BlackBerry" or "Defendant") concerning the provision of public relations services to BlackBerry by Plaintiff Brodeur & Coville, LLC ("Brodeur" or "Plaintiff," and, together with BlackBerry, the "Parties").

2.      For the last sixteen years, Brodeur served as a public relations agency to BlackBerry pursuant to a written contract and established course of dealings.  In late 2012 and early 2013, BlackBerry demanded a substantial increase in the public relations and communications services that Brodeur had been providing to BlackBerry.  In this time frame, BlackBerry was undergoing a "make or break" campaign to launch the new BlackBerry 10 operating system as well as the new BlackBerry Q10 and Z10 smartphones.  The launch was crucial to BlackBerry's attempt to revitalize its corporate image in a time when BlackBerry was losing substantial market share to its competitors.

3.      Brodeur met the increased demands of BlackBerry during this time period, often working around the clock to deliver on frequent and last minute demands of BlackBerry.

4.     Despite Brodeur's performance of these services, BlackBerry has refused to compensate Brodeur for the full value of those services, in breach of its contract with Brodeur, the implied covenant of good faith and fair dealing, and Massachusetts General Laws chapter 93A,  among other claims.

5.     In addition, BlackBerry made willfully misleading statements and omissions to Brodeur to induce Brodeur to continue providing services to BlackBerry during this critical time period, without any intent to provide Brodeur with compensation for those services and with a knowing intent not to continue to engage Brodeur as its public relations agency after BlackBerry had captured and enjoyed the benefit of Brodeur's services.

6.     Despite Brodeur's performance under the contract as well as its provision of valuable services from which BlackBerry has been enriched, BlackBerry has failed to make required payments, in clear breach of the Parties' contract and course of dealings.  Further, BlackBerry has demonstrated a willful and deliberate intent not to make any of the payments it owes to Brodeur.

## THE PARTIES

7.     Brodeur is a limited liability company organized under the laws of Delaware, with its principal place of business in Boston, Massachusetts.  Brodeur is a leading public relations agency whose business is to provide a range of communications, branding, marketing, social media, and public relations services to a broad range of clients.

8.     Research in Motion Limited, which does business under the name BlackBerry, is a public company incorporated under the laws of Ontario, Canada, with its principal place of business in Waterloo, Ontario, Canada, and offices throughout North America, Europe, and Asia.

BlackBerry provides mobile communications products and services, including BlackBerry smartphones, tablets, software, and accessories.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.  Diversity of citizenship exists between the Parties, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10.     This Court has personal jurisdiction over the Defendant because, under M.G.L. c. 223A, § 3(a), this action arises out of Defendant's transaction of business within the Commonwealth of Massachusetts.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claims occurred in this district.

## FACTS

### The Agreement

12.     On or around May 23, 1997, Brodeur and BlackBerry entered into a Public Relations Agreement (the "Agreement") by which Brodeur agreed to provide "consultation, planning, media contract, writing and placement of articles, and other public relations related activities" to BlackBerry in exchange for monetary compensation.  A true and correct copy of the Agreement is attached hereto as Exhibit 1.

13.     The Agreement contains several "terms of payment" including that BlackBerry pay Brodeur's invoices within 30 days of invoice dates and that BlackBerry "agree to reimburse" Brodeur "[i]n the event that [Brodeur] incur[s] costs and/or fees in an effort to collect on [its] invoices."  Agreement §§  5.1; 5.3.

14.     The Agreement provides that it shall continue until terminated by 30 days' notice in writing given by either party to the other.  Agreement §  12.1.

15.     On April 25, 2013, Heidi Davidson, Senior Vice President of Corporate Communications for BlackBerry, sent a letter to Brodeur purporting to provide notice that BlackBerry would no longer be retaining Brodeur for public relations services effective June 30, 2013 (the "Termination Letter").  In the Termination Letter, Ms. Davidson thanked Brodeur for its "ongoing support, dedication to BlackBerry and patience during [BlackBerry's] review" of its public relations agency support model.

16.     In the Termination Letter, BlackBerry also stated:  "I would like to take this opportunity to sincerely thank you for the public relations services that you have been providing to BlackBerry over the years, most recently during the launch of the BlackBerry 10 platform. Your support and dedication to the continued success of BlackBerry is greatly appreciated."

17.     In addition, in an email to Brodeur's CEO accompanying the Termination Letter, Ms. Davidson wrote:  "Please make no mistake that we are incredibly grateful for the loyalty and commitment that Brodeur has made to us over the course of our relationship and please know that we do value the close relationships with members of the team.  We greatly appreciate it."

18.     The Agreement remained in force from the date of its execution in 1997 until June 30, 2013.  Throughout that time, Brodeur met its obligations under the Agreement.

19.     Over the years of the relationship between BlackBerry and Brodeur, BlackBerry provided Brodeur with compensation for services in several ways.

20.     First, BlackBerry paid Brodeur a monthly retainer for certain core services. Those core services were agreed upon between BlackBerry and Brodeur and included such services as monitoring media interviews, responding to inquiries, distributing press releases, and

supporting product reviews, among other defined services.  The core services also included

explicit services that were excluded from the retainer scope.

21.     Second, BlackBerry paid Brodeur fees for specific projects that were separate and

apart from the retainer services.

22.     Third, it was typical for BlackBerry to maintain project budgets that would be

"bucketed" for activities that would be allocated over the course of a quarter as business needs

warranted.  For example, an unplanned media tour or an event to support a business unit would

fall into this category.  Historically, Brodeur was given visibility into these budgets and would

work with BlackBerry to allocate and manage them.  As a result, this regularly required Brodeur

to reconcile its service with BlackBerry at the end of each quarter in the event that Brodeur

provided services that exceeded the scope of services covered by the retainer or the separate

projects.  In these cases, BlackBerry would "true up" the services with Brodeur in order to

provide Brodeur with equitable relief by either agreeing to a combination of additional

compensation and/or adjusting subsequent quarters to allow for increased levels of

service/compensation.  Beginning in the fall of 2012, however, as a result of a change in

management, Brodeur was not given that same visibility.  Prior to this timeframe, the true up

process was handled by different management within BlackBerry.

**Launch of BlackBerry 10**

23.     For approximately sixteen years, between 1997 and 2013, Brodeur provided

public relations and communications services to BlackBerry.

24.     Those services culminated in late 2012 and early 2013 with Brodeur's role in

BlackBerry's launch of BlackBerry 10, a new version of the BlackBerry software, and the

BlackBerry Z10 and Q10 smartphones.  In the years leading up to the launch, BlackBerry had

been losing smartphone market share to Apple and Google.  As a result, the successful launch of

the BlackBerry 10 software and products was critical to BlackBerry's continued success.

BlackBerry launched these new systems and phones in early 2013 in an attempt to revitalize its

corporate brand and gain market share.

      25.     The success of this launch was of critical importance to BlackBerry.  Analysts and

experts across the industry widely noted that the future of the company depended on the

successful launch and acceptance in the market of BlackBerry 10.  Indeed, in a quarterly

earnings call in June 2012, BlackBerry's CEO Thorsten Heins said that "[t]he successful launch

of the BlackBerry 10 platform, and the delivery of high quality, full-featured BlackBerry 10

smartphones, remains the Company's number one priority."  Just a few months later, in

September 2012, he called BlackBerry 10 the company's "most important launch ever."

      26.     As a result, BlackBerry implemented an aggressive public relations and

communications campaign leading up to and following the launch that was unlike anything that

BlackBerry had done in recent years, and was well in excess of any work that Brodeur had been

doing under the scope of its services for BlackBerry in earlier years.

      27.     The launch was met with resounding praise and critical acclaim across the

industry.  The launch in January resulted in more than 13,000 news articles and broadcast stories

in North America alone.  CEO Thorsten Heins claimed in his speech at the launch event:  "This

is one of the biggest launches in our industry."  Some of the most influential journalists in the

world turned from critics of BlackBerry to supporters.

      28.     BlackBerry heavily re-marketed the positive press it received with the help of

Brodeur in advertising and other promotional activities to help sell the new products.  It earned

substantial gains to its reputation as a result of the launch.  In metrics used to measure media

sentiment, BlackBerry moved from 78% negative sentiment in July of 2012 to 92% positive sentiment at the time of the launch.

29.     That success was not easily obtained.  BlackBerry's Vice-President for North America Communications, Adam Emery, and his project managers frequently asked Brodeur to undertake projects and services that fell outside of the retainer scope of work, with little advance notice and short turnaround times.  Brodeur met the demands of BlackBerry and provided those services despite the frenetic pace at which they were demanded and the often caustic treatment of Brodeur's staff by Mr. Emery.  Brodeur, nevertheless, agreed to meet those demands in reliance on the Parties' course of dealings in which BlackBerry always compensated Brodeur after the completion of over-service.

30.     Brodeur invested substantial resources at BlackBerry's request to meet BlackBerry's demands for services and projects in connection with the launch.  Brodeur's staff worked nights and weekends to meet those demands, and invested thousands of hours of time.

31.     The demands made on Brodeur exceeded the regular scope of services covered by the core retainer.  Specifically, over a six month period, BlackBerry asked Brodeur to develop numerous messaging and communications plans and documents for unplanned events and activities.  Some of the activities were related to real-time events and others were related to new programs that BlackBerry put in place and asked Brodeur to support.  Blackberry also asked Brodeur to take on last minute unplanned and unbudgeted events and activities such as pre-planning and execution around client and industry developments.

32.     BlackBerry compounded the demands on Brodeur during this time period by BlackBerry's own reduction in its internal communications staff.  During this time period, BlackBerry's staff was reduced through terminations and resignations.  As a result, BlackBerry

asked Brodeur to take on tasks that would normally have been executed by BlackBerry, including such routine work as locating BlackBerry's own internal documents, editing BlackBerry's documents for it, and coordinating briefings.

33.     Overall, Brodeur spent over 3,000 hours on services that fell outside of the scope of the retainer services during this time period, at a cost to Brodeur of approximately $700,000. The services fall into at least the following categories:

(a)     Approximately 1800 hours on out-of-scope activities that include major launch support for the BlackBerry 10 US launch media tour, Game Developer Conference, CES Event support, BlackBerry Experience Forums, CrackBerry Meetup, crisis management, and additional team support to backfill BlackBerry's client team;

(b)     Approximately 700 hours on the BlackBerry Keep Moving Project that include planning and coordination around, among other things, the launch of an Alicia Keys project, the launch of a Neil Gaiman project, and the launch of Robert Rodriguez project;

(c)     Approximately 550 hours on BlackBerry Twitter projects;

(d)     Approximately 160 hours on the development and support of the BlackBerry United States Bridge PR launch plan;

(e)     Approximately 50 hours on BlackBerry 10 Support, including the BlackBerry Z10 Gold Code Tour support and coverage reports;

(f)     Approximately 50 hours on the BlackBerry Speakers Bureau;

(g)     Approximately 37 hours on BlackBerry Measurement sentiment reports;

(h)     Approximately 50 hours on a RIM Press Tour; and

(i)     Approximately 20 hours on US Bridge Regional Tours, including the Q10 Gold Code Tour.

34.     These amounts are in excess of hundreds of additional hours that Brodeur devoted to fulfilling the scope of work covered by the retainer fee, as well as hundreds of hours devoted to separately negotiated projects.

35.     Despite Brodeur's substantial investment of time and resources to deliver these services at BlackBerry's request, BlackBerry has failed to fully compensate Brodeur.

36.     BlackBerry was aware that it was requesting services outside of the scope of services covered by the monthly retainer.  Moreover, the requests for these services came directly from BlackBerry's own project managers, who often provided Brodeur with very little time to execute on the service, let alone negotiate over the cost of the services.

37.     An example of one of the out-of-scope programs that BlackBerry asked Brodeur to support were BlackBerry Experience Forums.  These Forums are a series of B2B-focused events designed to showcase the BlackBerry 10 platform and BlackBerry Enterprise Service 10 product.  Under the ordinary course of dealings between the parties, BlackBerry would have run these programs itself.  Because it was short-staffed, however, BlackBerry asked Brodeur to drive the PR programs for the events.  BlackBerry initially asked Brodeur to drive the Forums for two cities, but quickly expanded its request to cover the management, coordination, and execution of events across seven cities.  These types of programs are not covered by the retainer.

38.     Similarly, BlackBerry asked Brodeur to take over and schedule the media tour activity for the BlackBerry 10 launch in the United States.  The media tour was supposed to be handled by BlackBerry internally, but instead, BlackBerry asked Brodeur to handle the media

tour.  Media tours are not covered by the retainer and explicitly listed as services that are out of scope of the retainer.

39.     The BlackBerry United States Bridge Public Relations plan is another example of services provided outside the scope of the retainer for which BlackBerry has failed to compensate Brodeur.  This activity involved the entire strategic launch plan for the BlackBerry Z10 and Q10 smartphones.  As such, it was not normal quarterly activity such that it would be covered by the retainer.  Indeed, Brodeur only handled this activity because BlackBerry failed to deliver a plan itself internally as planned.  At that point, Mr. Emery apologized to Brodeur for foisting a "fire drill" on Brodeur and proceeded to demand that Brodeur develop this key initiative.

40.     These are only a few examples of last minute, out of scope services demanded by BlackBerry.

<h3 style="text-align:center">Scope of Services</h3>

41.     The scope of the services covered by the retainer fee were disclosed and negotiated with BlackBerry.  BlackBerry knew or should have known which services were covered by the retainer fee and which services were not.

42.     In early 2012, over six months before the planning for the BlackBerry 10 launch, Brodeur had extensive discussions with BlackBerry about the scope of the retainer and the extent of over-service provided outside of the retainer.  Brodeur's head of consumer marketing, Michael Brewer, engaged in those discussions with Diane Mohr, the individual at BlackBerry then in charge of managing the retainer budget on BlackBerry's behalf, over email, telephone, and in person.  Those discussions culminated in an analysis in August 2012 that set forth what services were agreed to be in and out of the scope of the retainer.

43.     Brodeur relied on BlackBerry's representations and agreements with respect to the scope of services.

44.     Ms. Mohr left BlackBerry in or about November 2012, when BlackBerry brought on Mr. Emery to manage North American communications.  Brodeur sought to familiarize Mr. Emery with the results of the conversations with his predecessors about the retainer.  To that end, on or about December 14, 2012, Brodeur sent to Mr. Emery the list of agreed services that fell within and outside the scope of the retainer.  Brodeur offered to speak with Mr. Emery to discuss scope with Mr. Emery, but Mr. Emery never asked to speak with Brodeur on the topic.

45.     At no point following Brodeur's transmission of the December 14, 2012 list of services did BlackBerry ever contest the list of services or indicate that it disagreed with the scope of services.

46.     Moreover, the list of services covered by the retainer is also attached to the purchase orders submitted and approved by BlackBerry for Brodeur's retainer services.  At no point did BlackBerry ever dispute the list of services attached to the retainer purchase orders.

**BlackBerry's Global Agency Review**

47.     At the same time that BlackBerry was placing increasing demands on Brodeur for services, BlackBerry announced in November 2012 that it was going to seek proposals from public relations agencies for BlackBerry's global public relations services in order to consolidate its roster of agencies as part of a company-wide cost savings initiative.  Thus in the middle of its exhaustive work on the BlackBerry 10 launch, Brodeur was asked to simultaneously pitch for BlackBerry's global business going forward.

48.     As a result of these competing pressures, on or about October 2012, Brodeur's CEO Andrea Coville had a phone call with Ms. Davidson of BlackBerry in which Ms. Coville

asked Ms. Davidson how Brodeur should allocate its time in light of the competing demands of the launch and the pitch.  Ms. Davidson responded that Brodeur should put its energy into the launch not the pitch because "Brodeur did not have anything to worry about" with the pitch. Ms. Davidson told Ms. Coville and Mr. Brewer that there was no "scenario in which Brodeur would not be part of BlackBerry's future."  Ms. Davidson told Ms. Coville that she should view the pitch as an "opportunity to expand" Brodeur's work for BlackBerry.

49.     In subsequent conversations in mid-November 2012 and early January 2013, Ms. Davidson repeatedly reassured Ms. Coville and Mr. Brewer that Brodeur "had nothing to worry about" with respect to the pitch.

50.     In reliance on these assurances, Brodeur continued to focus its efforts on the launch.  In addition, in reliance on these assurances, Brodeur undertook numerous projects for BlackBerry that BlackBerry demanded without providing Brodeur with sufficient time to negotiate the cost and fees associated with those projects.  Brodeur did so in reasonable reliance on the expectation that the Parties would true up those excess fees in their usual quarterly process.

51.     Had Brodeur expected its relationship with BlackBerry to come to an end in 2013 without BlackBerry following through on the course of dealings to true up over-service, Brodeur would not have invested its time and resources into fulfilling these extra demands, at a cost of hundreds of thousands of dollars to Brodeur.

52.     Brodeur made its pitch to BlackBerry on February 26, 2013, the same time that it was engaged in the BlackBerry 10 launch process.  Despite the division of Brodeur's attention, Brodeur's pitch presentation was received with high praise.  Indeed, following the presentation, Ms. Davidson pulled Ms. Coville aside to praise her for the presentation.  Ms. Davidson told Ms.

Coville that Brodeur had nothing to worry about and promised to give Brodeur feedback quickly. At the end of the presentation, Ms. Davidson told Ms. Coville and Mr. Brewer that the Brodeur presentation was "well played" and also said that Brodeur deserved feedback right away.  In the presentation room, Ms. Davidson promised that feedback would come the following Monday. On Monday, and for weeks later, however, no feedback was offered.

53.      Following the presentation, Brodeur regularly asked BlackBerry for feedback about the pitch.  Ms. Coville told Ms. Davidson that it was critical to Brodeur's business that Brodeur receive advance notice of any potential negative impact on the company.  Ms. Davidson repeatedly assured Ms. Coville that Brodeur's presentation was strong and that she would provide feedback on the pitch and BlackBerry's decision promptly.

54.      Despite these assurances by Ms. Davidson, over two months went by without any feedback from BlackBerry.

55.      During that time period, while Brodeur waited for BlackBerry's promised feedback, BlackBerry continued make demands for over-service from Brodeur, which Brodeur met.

56.      Finally, on April 25, 2013, BlackBerry notified Brodeur that BlackBerry had not selected Brodeur for the consolidated global agency going forward.  Notably, this notification came the day after the official product reviews for the second of two launch products, the Q10, appeared in the media, signaling the culmination of a successful PR launch.

57.      Upon information and belief, BlackBerry had decided well in advance of April 25, 2013 to select an agency other than Brodeur.  Upon information and belief, BlackBerry deliberately delayed notifying Brodeur of its decision to select a different firm in order to benefit from Brodeur's services without any intention of compensating Brodeur for those services.

13

58.     Despite Brodeur's performance under the Agreement, BlackBerry failed to compensate Brodeur for those services.

59.     Following the Termination Letter, Brodeur sent a letter to BlackBerry demanding compensation for services rendered.  BlackBerry has refused to compensate Brodeur for services rendered at a cost to Brodeur of approximately $700,000.

## COUNT I
### (Breach of Contract)

60.     Brodeur  hereby incorporates the allegations of paragraphs 1-51 of the Complaint as if fully set forth herein.

61.     Brodeur and BlackBerry have a valid contract for consideration that obligates BlackBerry to compensate Brodeur for services requested and rendered.

62.     Brodeur performed its obligations under the Agreement.

63.     BlackBerry has failed to compensate Brodeur for services it demanded pursuant to the contractual relationship.

64.     BlackBerry has also failed to compensate Brodeur for its costs and legal fees in its efforts to collect on the amounts owed to Brodeur in violation of Section 5.3 of the Agreement.

65.     BlackBerry's nonpayment and its refusal to comply with its contractual obligations under the Agreement constitute breaches of the Agreement.

66.     As a result of BlackBerry's breach of the Agreement, Brodeur has suffered and will continue to suffer damages in an amount to be determined at trial.

## COUNT II
### (Breach of the Implied Covenant of
### Good Faith and Fair Dealing)

67.     Brodeur hereby incorporates the allegations of paragraphs 1-59 of the Complaint as if fully set forth herein.

68.     The Parties' Agreement contains an implied covenant of good faith and fair dealing.

69.     BlackBerry's conduct, as described above, constitutes a breach of the implied covenant of good faith and fair dealing.

70.     Brodeur has suffered and will continue to suffer damages as a result of BlackBerry's breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial.

### COUNT III
### (Fraud )

71.     Brodeur hereby incorporates the allegations of paragraphs 1-63 of the Complaint as if fully set forth herein.

72.     As set forth above, BlackBerry made knowingly false representations of material facts to Brodeur concerning the Global Agency Review.  On information and belief, BlackBerry told Brodeur that it had nothing to worry about with respect to the Global Agency Review to induce Brodeur to continue to provide high levels of over-service with no intention to compensate Brodeur for that work or to select Brodeur in the Global Agency Review.  Moreover, on information and belief, BlackBerry deliberately remained silent in response to Brodeur's requests for information following the presentation to induce Brodeur to continue to provide high levels of over-service with no intention of compensating Brodeur for that work or of selecting Brodeur in the Global Agency Review.

73.     In reasonable reliance on those statements and the Parties' prior course of dealing of engaging in a true-up of over-service at the end of a quarter, Brodeur continued to meet the escalating demands of BlackBerry without requiring advance payment.

74.     Brodeur has not been compensated by BlackBerry for those services.

75.     Brodeur has suffered and will continue to suffer damages as a result of BlackBerry's false representations in an amount to be determined at trial.

## COUNT IV
### (Negligent Misrepresentation)

76.     Brodeur hereby incorporates the allegations of paragraphs 1-68 of the Complaint as if fully set forth herein.

77.     As set forth above, BlackBerry made negligently false representations of material facts to Brodeur concerning the Global Agency Review.  On information and belief, BlackBerry told Brodeur that it had nothing to worry about with respect to the Global Agency Review to induce Brodeur to continue to provide high levels of over-service with no intention to compensate Brodeur for that work or to select Brodeur in the Global Agency Review.  Moreover, on information and belief, BlackBerry deliberately remained silent in response to Brodeur's requests for information following the presentation to induce Brodeur to continue to provide high levels of over-service with no intention of compensating Brodeur for that work or of selecting Brodeur in the Global Agency Review.

78.     In reasonable reliance on those statements and the Parties' prior course of dealing of engaging in a true-up of over-service at the end of a quarter, Brodeur continued to meet the escalating demands of BlackBerry without requiring advance payment.

79.     Brodeur has not been compensated by BlackBerry for those services.

80.     Brodeur has suffered and will continue to suffer damages as a result of BlackBerry's false representations in an amount to be determined at trial.

## COUNT V
### (Unjust Enrichment)

81.     Brodeur hereby incorporates the allegations of paragraphs 1-73 of the Complaint as if fully set forth herein.

82.     As described above, BlackBerry received services from Brodeur from which it has benefitted substantially.  BlackBerry accepted Brodeur's services with the full understanding that it was required to compensate Brodeur for those services.

83.     Brodeur reasonably expected compensation from BlackBerry when it performed the services described herein at BlackBerry's demand.

84.     Despite Brodeur's performance of the services requested of it by BlackBerry, and despite BlackBerry's acceptance of those services to its substantial benefit, BlackBerry has failed and continues to fail and refuse to compensate Brodeur for the full value of the services.

85.     BlackBerry's failure and refusals have substantially damaged Brodeur, for which damage BlackBerry is liable.

86.     BlackBerry has been unjustly enriched by Brodeur's services.

87.     Brodeur has suffered and will continue to suffer damages as a result of BlackBerry's actions in an amount to be determined at trial.

## COUNT VI
### (Quantum Meruit)

88.     Brodeur hereby incorporates the allegations of paragraphs 1-80 of the Complaint as if fully set forth herein.

89.     As described above, BlackBerry received services from Brodeur from which it has benefitted substantially.  BlackBerry accepted Brodeur's services with the full understanding that it was required to compensate Brodeur for those services.

90.     Brodeur reasonably expected compensation from BlackBerry when it performed the services described herein at BlackBerry's demand.

91.     Despite Brodeur's performance of the services requested of it by BlackBerry, and despite BlackBerry's acceptance of those services to its substantial benefit, BlackBerry has failed and continues to fail and refuse to compensate Brodeur for the full value of the services.

92.     BlackBerry's failure and refusals have substantially damaged Brodeur, for which damage BlackBerry is liable.

93.     BlackBerry has been unjustly enriched by Brodeur's services.

94.     Brodeur has suffered and will continue to suffer damages as a result of BlackBerry's actions in an amount to be determined at trial.

<u>COUNT VII</u>
**(Violation of G.L. c. 93A)**

95.     Brodeur hereby incorporates the allegations of paragraphs 1-87 of the Complaint as if fully set forth herein.

96.     Section 2 of the Massachusetts Consumer Protection and Unfair Trade Practices Act, Mass. Gen. Laws ch. 93A, makes it unlawful for any person to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  *Id*. § 2.

97.     Section 11 of chapter 93A establishes a cause of action for "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two," and further provides for the award of treble damages, attorneys' fees, costs and equitable relief.  *Id*.

98.     Brodeur is engaged in trade or commerce as defined by Massachusetts General Laws chapter 93A, Sections 1 and 11.

99.     BlackBerry is engaged in trade or commerce as defined by Massachusetts General Laws chapter 93A, Sections 1 and 11.

100.    By virtue of the acts, conduct, and practices described above, BlackBerry has engaged in unfair methods of competition and unfair and deceptive trade practices in willful and knowing violation of Sections 2 and 11 of Massachusetts General Laws chapter 93A.

101.    BlackBerry's conduct constituting unfair methods of competition and unfair and deceptive trade practices occurred primarily and substantially within the Commonwealth of Massachusetts.

102.    Brodeur has suffered and continues to suffer damages as a result of BlackBerry's unfair methods of competition and unfair and deceptive trade practices in an amount to be determined at trial.  In addition, BlackBerry is liable to Brodeur for treble the actual damages proven at trial, together with attorneys' fees, interest and costs.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.      Damages in an amount to be determined at trial;

2.      Treble damages arising out of BlackBerry's breach of M.G.L. c. 93A;

3.      Attorneys' fees and costs pursuant to §  5.3 of the Agreement;

4.      Attorneys' fees and costs pursuant to M.G.L. c. 93A, § 11; and

5.      Such other further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable under law.

Respectfully submitted,

Brodeur & Coville, LLC

By its attorney,


/s/ Dahlia S. Fetouh
Dahlia S. Fetouh (BBO #651196)
Goodwin Procter LLP
53 State Street
Boston, Massachusetts  02109
Tel.:  617.570.1000
Fax:  617.523.1231
dfetouh@goodwinprocter.com

Dated: September 20, 2013